Gwendolyn **FREEMAN**, Plaintiff,

v.

**William A. HALTER,**[1] **Commissioner of Social Security Administration, Defendant.**

**No. Civ. 3:00CV397–H.**

United States District Court,
W.D. North Carolina,
Charlotte Division.

April 10, 2001.

---

1. William A. Halter became Acting Commissioner of Social Security on January 20, 2001. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, William A. Halter is substituted, therefore, for Commissioner Kenneth S. Apfel as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

John F. Eichorn, Rockingham, NC, for plaintiff.

Joseph L. Brinkley, U.S. Attorney's Office, Charlotte, NC, for defendant.

## MEMORANDUM AND ORDER

HORN, Chief United States Magistrate Judge.

**THIS MATTER** is before the Court on the Plaintiff's "Motion for Summary Judgment" and "Plaintiff's Memorandum ..." (both document # 8) filed January 30, 2001, and Defendant's "Motion For Summary Judgment" (document # 9) and "Memorandum in Support of the Commissioner's Decision" (document # 10), both filed March 30, 2001. The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c), and these motions are now ripe for disposition.

Having considered the written arguments, administrative record, and applicable authority, the undersigned finds that the Defendant's decision to deny Plaintiff Social Security disability benefits is supported by substantial evidence. Accordingly, the undersigned will *deny* Plaintiff's Motion for Summary Judgment; *grant* Defendant's Motion for Summary Judgment; and *affirm* the Commissioner's decision.

### I. *PROCEDURAL HISTORY*

On October 8, 1997, the Plaintiff filed an application for disability insurance ("DI") benefits and Supplemental Security Income ("SSI"), alleging disability since July 1, 1996, based primarily on "degenerative disc (osteoarthritis) of the spine." (Tr. 50.) The Plaintiff's claim was denied initially and on reconsideration.

Plaintiff requested a hearing, which was held on December 2, 1998. On December 29, 1998, the ALJ issued an opinion denying the Plaintiff's claim. Plaintiff filed a Request for Review of Hearing Decision on March 4, 1999. After receiving addi-

tional evidence, the Appeals Council denied her request for review on June 22, 2000, making the hearing decision the final decision of the Commissioner. The Plaintiff filed this action on August 17, 2000, and the parties' cross-motions for summary judgment are now ripe for the Court's consideration.

## II. *FACTUAL BACKGROUND*

Plaintiff testified that she was born on November 23, 1962, and was 36 years old at the time of the hearing; that she was married and had three children under age six and was pregnant with her fourth child; that she was 5' 8" tall and weighed 251 pounds;[2] that she had a master's degree in education; that she had worked as a day care center director for 15 years, until the center closed;[3] that she had not attended vocational rehabilitation; that at the time her alleged disability began—July 1, 1996—due to pain in her neck, shoulders, hands, and lower back, she was no longer working outside the home, but was instead caring for her children; and that following the onset of her alleged disability, the Plaintiff and her husband decided to have a fourth child.

Regarding her medical and emotional condition, Plaintiff testified that she had been in constant pain since June 1996; that she was in an automobile accident in April 1996; that she had undergone surgery, which had relieved some of her pain; that she had to rest frequently, use pain medication, a heating pad, and extra pillows when she slept; that she was right-handed, but experienced more pain in her left arm; that her pain caused difficulty concentrating; and that she had difficulty walking, standing, and sitting.

As to daily activities, the Plaintiff testified that she took care of all of her personal needs; that she got her children ready to go to school and daycare each morning; that she drove; that she picked up her son from school each day; that she grocery shopped, cooked, loaded the dishwasher, loaded clothes in the washer, and bathed her children; but that her husband did the other household cleaning, vacuuming, mopping, and sweeping.

A vocational expert ("VE") testified that Plaintiff's past work was sedentary and skilled (daycare center director) with significant managerial and educational skills. The ALJ presented the VE with the following hypothetical:

a residual functional capacity for a wide range of light and sedentary work on a sustained basis ... certain significant nonexertional impairments ... relating to degenerative disc disease in her neck ... pain in ... left shoulder and arm ... low back pain and depression and anxiety ... preclude[d] ... from any work requiring rapid movement of her neck ... from continuous use of her left arm ... from repetitive overhead reaching ... from climbing poles, ladders, and scaffolds ... from repetitive bending or stooping ... would need a job ... [with] simple instructions with a sit/stand option ... taking into account those limitations and the claimant's age, education and past relevant work experience ... would there be jobs ... that she could do?

(Tr. 262–63.)

The VE testified that with these limitations, Plaintiff could work as a library page, a gate tender, a surveillance systems monitor, and a photo finisher; and that a total of 16,300 of these jobs were available

---

**2.** Plaintiff testified that she had only gained 2 pounds due to her pregnancy.

**3.** Agency records indicate the Plaintiff last worked in 1994. (Tr. 49.)

in North Carolina. On cross-examination, the VE further testified that the library page job required a "fair amount" of bending and stooping and that most people use both hands in the photo finisher job. (Tr. 265–66.)

The record also contains a number of representations by Plaintiff as contained in her various applications in support of her claim. On a Disability Report dated September 19, 1997, Plaintiff stated that her disabling condition was "degenerative disc (osteoarthritis) of the spine" (Tr. 50); that she had "extreme pain in her neck, left arm and hand, and right arm and hand . . . and burning and numbness . . . and horrible headaches" *Id.*; that she first saw a doctor for her condition in September 1996; that she underwent surgery in October–November 1996; that she had received nerve root block injections; that her doctor limited her to "no lifting anything heavier than a phonebook, only very light housework, no paperwork, or repetitive tasks" (Tr. 54); and that she cooked, drove, and did "small tasks" around the house. *Id.*

A November 20, 1997 Report of Contact reflects the Plaintiff stated that she loaded the dishwasher and the washing machine; that she sat most of the day and watched television; that she got her children ready for school and daycare; that she visited her mother; that she cooked; and that she drove.

On a Reconsideration Disability Report, dated January 14, 1998, Plaintiff stated that her condition was worse; and that her doctor had told her not to lift or use her arms and hands. The Agency interviewer noted no deficiency in the Plaintiff's ability to read, write, understand, answer, hear, speak, use her hands, see, walk, or sit; and

concluded "[Plaintiff's] general appearance and behavior were good . . . there was nothing unusual noted." (Tr. 76.)

On a Claimant's Statement When Request For Hearing is Filed, dated October 20, 1998, Plaintiff stated that her condition was worse; that she was suffering depression; and that she depended more on her mother and husband to care for the children.

On December 31, 1997, A.K. Goel, M.D., completed a Physical Residual Functional Capacity Assessment noting that Plaintiff could occasionally lift 50 pounds and frequently lift 25 pounds; that she could sit, stand, and/or walk 6 hours in an 8 hour workday; that her ability to push and/or pull was unlimited; that she could climb ladders, ropes, or scaffolds only occasionally; that she had limited ability to reach overhead; that she should avoid concentrated exposure to hazards, heights, and machinery; that her medical records showed a cervical laminectomy and diskectomy in 1996; and that in June 1997, her treating physician characterized her degenerative disc disease as "mild" or "slight." (Tr. 90.)

On January 30, 1998, Charles A. Burkhart, M.D., completed a Physical Residual Functional Capacity Assessment noting that Plaintiff could occasionally lift 50 pounds and frequently lift 25 pounds; that she could sit, stand, and/or walk 6 hours in an 8 hour workday; that her ability to push and/or pull was limited in her arms; that she had limited ability to reach overhead; and that on January 5, 1998, her treating physician had written a "To Whom It May Concern" letter stating Plaintiff was disabled and unable to care for her children for six months,[4] but had

---

4. This opinion appears to have been given to enable the Plaintiff to enroll her children in daycare. The Plaintiff has not challenged the

ALJ's decision not to give the opinion controlling weight. *See* Plaintiff's "Motion for Summary Judgment" and "Brief Supporting . . ."

also noted in his chart that the Plaintiff was "functional." (Tr. 100.)

The medicals records presented to the ALJ (at or after the hearing) establish that on September 30, 1996, Plaintiff, complaining of pain in her neck, left shoulder, left arm, and back, saw Dr. Anthony Asher, Carolina Neurosurgery and Spine Associates, who noted that Plaintiff described her occupation as "homemaker"; and that a CT scan of Plaintiff's cervical spine showed mild narrowing.

On October 29, 1996, and after several weeks of conservative treatment, the Plaintiff underwent a foraminotomy and laminotomy. Plaintiff recovered from her surgery and attended physical therapy. On December 16, 1996, Dr. Asher noted that Plaintiff was "doing well"; that she was able to control the tightness in her neck and shoulder with exercise and Tylenol; and that X-rays indicated no bony abnormalities. On March 3, 1997, Dr. Asher advised Plaintiff to slowly increase her activity.

On April 21, 1997, Plaintiff, complaining of neck pain following being rear-ended in an automobile accident, saw Dr. Asher, who noted that the Plaintiff stated that the auto accident exacerbated her neck pain; but that she had been picking up her children a lot, which also aggravated her pain. Nerve block injections provided temporary relief over the next several months.

On January 5, 1998, Dr. Asher reported that Plaintiff was in a "maintenance mode"; that he hoped to avoid a subsequent surgery; that Plaintiff was "more or less functional"; that her strength was stable; and that Plaintiff was to return in six months. (Tr. 134.)

On February 4, 1998, Plaintiff, exhibiting symptoms of anxiety and depression, was seen at Piedmont Behavioral Healthcare by Dr. Devendra Shah, a psychiatrist, who noted that Plaintiff suffered a "depressive disorder, not other specified"; and that Plaintiff was prescribed Serzone, an anti-depressant. Plaintiff continued with visits to Piedmont Behavioral Healthcare through November 18, 1998, and the last note indicates that Plaintiff's depressive symptoms continued "to fluctuate with her physical well being" (Tr. 213); and that Plaintiff needed a note stating she was disabled in order to keep her children enrolled in daycare.

On March 13, 1998, Plaintiff underwent a nerve block injection and Dr. Asher wrote that it was difficult to determine what was causing Plaintiff's pain.

On March 24, 1998, Plaintiff, complaining of headaches, saw Dr. Adam Wegener, an internist, who noted that Plaintiff stated that her left arm pain had "substantially resolved" (Tr. 186); that Plaintiff had limited range of motion in her spine, diminished grip strength, and muscle wasting in her left forearm; that she walked with an antalgic gait possibly related to heel pain; and that he prescribed pain medication and treated Plaintiff for sinusitis. A bone scan revealed sinus problems but no other irregularities.

On April 16, 1998, Plaintiff called Dr. Asher's office to request pain medication after having over-exerted herself through excessive lifting.

On June 22, 1998, Dr. Asher determined that Plaintiff's condition was stable; that she looked "comfortable"; that he was un-

(both document # 8). Nevertheless, the undersigned finds that the ALJ properly discounted Dr. Asher's assessment, which was inconsistent with the record as a whole. *See*

20 C.F.R. §§ 404.1527(d), 416.927(d); *and Craig v. Chater,* 76 F.3d 585, 590 (4th Cir. 1996).

able to find any obvious structural source for her pain; and released Plaintiff to return as needed.

The ALJ considered all of the above recited evidence and determined that Plaintiff was not "disabled" for Social Security purposes. It is from this determination that Plaintiff appeals.

## III. *STANDARD OF REVIEW*

The Social Security Act, 42 U.S.C. § 405(g) and § 1383(c)(3), limits this Court's review of a final decision of the Commissioner to: (1) whether substantial evidence supports the Commissioner's decision, *Richardson v. Perales,* 402 U.S. 389, 390, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); and (2) whether the Commissioner applied the correct legal standards. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir.1990); *see also Hunter v. Sullivan,* 993 F.2d 31, 34 (4th Cir.1992) (*per curiam*). The district court does not review a final decision of the Commissioner *de novo.* *Smith v. Schweiker,* 795 F.2d 343, 345 (4th Cir.1986); *King v. Califano,* 599 F.2d 597, 599 (4th Cir.1979); *Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir.1972).

As the Social Security Act provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). In *Smith v. Heckler,* 782 F.2d 1176, 1179 (4th Cir.1986), *quoting Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), the Fourth Circuit defined "substantial evidence" thus:

Substantial evidence has been defined as being "more than a scintilla and do[ing]

more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*See also Seacrist v. Weinberger,* 538 F.2d 1054, 1056–57 (4th Cir.1976) ("We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence").

The Fourth Circuit has long emphasized that it is not for a reviewing court to reweigh the evidence, nor to substitute its judgment for that of the Commissioner, assuming the Commissioner's final decision is supported by substantial evidence. *Hays v. Sullivan,* 907 F.2d at 1456 (4th Cir.1990); *see also Smith v. Schweiker,* 795 F.2d at 345; *and Blalock v. Richardson,* 483 F.2d at 775. Indeed, this is true even if the reviewing court disagrees with the outcome—so long as there is "substantial evidence" in the record to support the final decision below. *Lester v. Schweiker,* 683 F.2d 838, 841 (4th Cir.1982).

## IV. *DISCUSSION OF CLAIM*

The question before the ALJ was whether at any time the Plaintiff became "disabled" as that term of art is defined for Social Security purposes.[5]

The ALJ considered the above-recited evidence and found after the hearing that Plaintiff had not engaged in substantial gainful activity since her alleged onset date; that the Plaintiff was a "younger individual" with a college education; that the Plaintiff suffered severe degenerative disc disease, which was a severe impair-

---

5. Under the Social Security Act, 42 U.S.C. § 301, *et seq.,* the term "disability" is defined as an:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.... *Pass v. Chater,* 65 F.3d 1200, 1203 (4th Cir.1995).

ment within the meaning of the Regulations; but that Plaintiff's impairment did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (a.k.a. "the Listings"); that Plaintiff was not able to perform her past relevant work; that she possessed the residual functional capacity to perform light[6] and sedentary[7] work, that provided a sit/stand option, had only simple instructions, and did not require rapid neck movements, continuous use of the left arm, repetitive bending or stooping, or lifting the left arm over the shoulder.

The ALJ then correctly shifted the burden to the Secretary to show the existence of other jobs in the national economy which the Plaintiff could perform. The VE's testimony, stated above and based on a hypothetical that factored in the above limitations, provided substantial evidence that there were a significant number of jobs in the national economy that the Plaintiff could perform.

The Plaintiff essentially appeals the ALJ's determination of her residual functional capacity. *See* Plaintiff's "Motion for Summary Judgment" and "Plaintiff's Memorandum ..." at 1 (both document # 8). The undersigned finds that Plaintiff's assertion of error is without merit,

however, and that substantial evidence supports the ALJ's conclusions regarding the Plaintiff's residual functional capacity.

The Social Security Regulations define "residual functional capacity" as "what [a claimant] can still do despite his limitations." 20 C.F.R. § 404.1545(a). The Commissioner is required to "first assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's] residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b). The Regulations also indicate that:

A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce [a claimant's] ability to do past work and other work.

*Id.*

The ALJ's opinion clearly indicates that he did, in fact, consider whether Plaintiff was limited in lifting, sitting, standing, walking, carrying, pushing, pulling or other physical functions. Agency evaluators concluded that she could lift 50 pounds occasionally and 25 pounds frequently—

---

6. "Light" work is defined in 20 C.F.R. § 404.1567(b) as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless

there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

7. "Sedentary" work is defined in 20 C.F.R. § 404.1567(a) as follows:

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and the other sedentary criteria are met.

requirements for "medium" work; that her strength, grip and dexterity were normal; that she could sit, stand, and/or walk 6 hours in an 8 hour workday; and that her ability to push and/or pull was limited in her arms. However, the ALJ found that Plaintiff was restricted to a degree commensurate with the performance of "light" work as defined in the Regulations. He imposed only the further restrictions on Plaintiff's residual functional capacity that he found to be supported by the medical records and Plaintiff's credible testimony—limiting light jobs to those that provided a sit/stand option; that had only simple instructions; and that did not require rapid neck movements, continuous use of the left arm, repetitive bending or stooping, or lifting the left arm over the shoulder.

At the outset, the undersigned notes that no doctor has ever concluded that the Plaintiff is permanently disabled or told the Plaintiff not to work. As noted above, on the same date—January 5, 1998—that Dr. Asher wrote a one sentence "To Whom It May Concern" letter that Plaintiff was disabled and could not care for her children for six months, he also wrote in the chart that Plaintiff was in a "maintenance mode"; that he hoped to avoid a subsequent surgery; that Plaintiff was "more or less functional"; and that her strength was stable. (Tr. 134.)

■ Rather than proving the existence of a disability, the record clearly supports the ALJ's essential conclusion: that Plaintiff suffered from—but was not disabled by—degenerative disc disease. This conclusion is bolstered by the fact that after her surgery, Dr. Asher described the Plaintiff as "doing well" on numerous occasions, could not find objective causes for Plaintiff's continued complaints of pain, and told her to increase her activities. On March 24, 1998, Plaintiff told Dr. Wegener

that her left arm pain had "substantially resolved" (Tr. 186). Further, the Plaintiff claimed her health problems prevented her from engaging in daily activities or working, but radiographic images revealed conditions described as "slight" or "mild."

Indeed, the Plaintiff did not stop working because of her alleged disability, but rather lost her job when the daycare center closed. She did not seek other employment, electing instead to care for her children at home for almost two years before her alleged onset date. On this point, see, e.g., Cauthen v. Finch, 426 F.2d 891, 892 (4th Cir.1970) (plaintiff's voluntary cessation of employment constituted substantial evidence of no disability).

Finally, there is substantial evidence in the record that physical therapy and pain medication were effective in alleviating some of the Plaintiff's pain. See, e.g., Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir.1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling"), citing Purdham v. Celebrezze, 349 F.2d 828, 830 (4th Cir. 1965); and Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir.1994) (evidence of treatment and medical regimen followed by claimant is proper basis for finding of no disability) (Hall, J., concurring for divided panel).

The record also establishes that Plaintiff engaged in significant daily life activities, such as taking care of all of her personal needs, caring for three small children, cooking, loading the dishwasher, doing laundry, driving a car, grocery shopping, visiting with her mother, and picking up her children from school; and that Plaintiff was able to perform basic cognitive and physical tasks. See, e.g., Gross, 785 F.2d at 1166; and Mickles, 29 F.3d at 921.

In addition to the ALJ's treatment of the medical records, he properly applied

the standard for determining a claimant's residual functioning capacity based on subjective complaints of pain, and the record contains substantial evidence to support the ALJ's conclusion that Plaintiff's testimony was *not* fully credible.

The determination of whether a person is disabled by non-exertional pain or other symptoms is a two-step process. "First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." *Craig v. Chater,* 76 F.3d 585, 594 (4th Cir.1996), *citing* 20 C.F.R. § 416.929(b); § 404.1529(b); 42 U.S.C. § 423(d)(5)(A). If there is such evidence, then the ALJ must evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects [his] ability to work." *Id.* at 595, *citing* 20 C.F.R. § 416.929(c)(1) *and* § 404.1529(c)(1). The regulations provide that this evaluation must take into account:

> not only the claimant's statements about his or her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it.

*Id.* (citations omitted).

The record contains evidence of Plaintiff's degenerative disc disease—a condition which *could* reasonably be expected to produce some of the pain claimed by Plaintiff—and thus the ALJ essentially found that Plaintiff could satisfy the first prong

of the test articulated in *Craig.* However, the ALJ evaluated the "intensity and persistence of [her] pain, and the extent to which it affects [her] ability to work," and essentially found Plaintiff's subjective description of her limitations not credible.

■ "The only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life." *Mickles,* 29 F.3d at 921, *citing Hunter v. Sullivan,* 993 F.2d 31 (4th Cir.1992) (claimant's failure to fill prescription for painkiller, which itself was indicated for only mild pain, and failure to follow medical and physical therapy regimen supported ALJ's inference that claimant's pain was not as severe as he asserted). As noted above, the record before the ALJ contained substantial evidence to support a finding of inconsistency between Plaintiff's claims of inability to work and her objective ability to carry on with moderate daily activities. Specifically, Plaintiff continued to take care of all of her personal needs, care for her children, do substantial household chores, drive a car, grocery shop, and visit family and friends.

Although the medical records in this case establish that Plaintiff experienced pain and mental and emotional difficulties to some extent or degree, as the Fourth Circuit has noted, it is the ALJ's responsibility, not the Court's, "to reconcile inconsistencies in the medical evidence." *Seacrist v. Weinberger,* 538 F.2d 1054, 1056–57 (4th Cir.1976). Moreover, the facts noted by the ALJ clearly support the ultimate conclusion that Plaintiff suffered from, but was not disabled from working by her combination of impairments.

■ Simply put, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the Secretary's designate,

the ALJ)." *Mickles v. Shalala*, 29 F.3d 918, 923 (4th Cir.1994), *citing Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir.1987). This is precisely such a case, as it contains substantial evidence to support the ALJ's determinations of the credibility of Plaintiff's subjective complaints of pain; her activities of daily life; and her residual functional capacity.

## V. *ORDER*

NOW, THEREFORE, IT IS ORDERED:

1. Plaintiff's "Motion For Summary Judgment" (document # 8) is **DENIED;** Defendant's "Motion for Summary Judgment" (document # 9) is **GRANTED;** and the Commissioner's decision is **AFFIRMED.**

2. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.