### Donald R. PITTMAN, Plaintiff,

v.

### Larry G. MASSANARI,[1] Commissioner of Social Security Administration, Defendant.

No. Civ. 3:00CV254–H.

United States District Court, W.D. North Carolina, Charlotte Division.

April 11, 2001.

---

**1.** Larry G. Massanari became Acting Commissioner of Social Security on March 29, 2001. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Larry G. Massanari is substituted, therefore, for Commissioner William A. Halter as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Harry B. Crow, Jr., Monroe, NC, for plaintiff.

Joseph L. Brinkley, U.S. Attorney's Office, Charlotte, NC, for defendant.

### MEMORANDUM AND ORDER

HORN, Chief United States Magistrate Judge.

**THIS MATTER** is before the Court on the "Plaintiff's Motion for Summary Judgment ..." and "Memorandum in Support ..." (both document # 13) filed February 2, 2001, and Defendant's "Motion For Summary Judgment" (document # 14) and "Memorandum in Support of the Commissioner's Decision" (document # 15), both filed April 2, 2001. The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c), and these motions are now ripe for disposition.

Having considered the written arguments, administrative record, and applicable authority, the undersigned finds that the Defendant's decision to deny Plaintiff Social Security disability benefits is supported by substantial evidence. Accordingly, the undersigned will *deny* Plaintiff's Motion for Summary Judgment; *grant* Defendant's Motion for Summary Judgment; and *affirm* the Commissioner's decision.

### I. PROCEDURAL HISTORY

On March 12, 1998, the Plaintiff filed an application for disability insurance ("DI") benefits and Supplemental Security Income ("SSI"), alleging disability since January 7, 1997, based primarily on "a hole in r[ight] tibia bone, back problems." (Tr. 54.) The Plaintiff's claim was denied initially and on reconsideration.

Plaintiff requested a hearing which was held on January 13, 1999. On February 2, 1999, the ALJ issued an opinion denying the Plaintiff's claim. Plaintiff filed a Request for Review of Hearing Decision on March 24, 1999. After receiving additional evidence, the Appeals Council denied his request for review on April 1, 2000, making the hearing decision the final decision of the Commissioner. The Plaintiff filed this action on June 7, 2000, and the parties' cross-motions for summary judgment are now ripe for the Court's consideration.

### II. FACTUAL BACKGROUND

Plaintiff testified that he was born on March 4, 1955, and was 43 years old at the time of the hearing; that he was divorced and lived with his fiancee and his 17 year-old son; that he completed the twelfth grade and could read and write; that he did not have a driver's license; that he had worked 21 years as a roofer and had last worked in January 1997; that he stopped working due to an infection and ensuing complications in his right knee; that he had not been to vocational rehabilitation; and that he had not looked for work.

Regarding his medical and emotional condition, Plaintiff testified that he was injured in a car accident in 1990, requiring surgery on his right knee; that he returned to work one year after the accident and had no medical absences from work for several years; that in January 1997, an infection developed around the screws and disks in his right knee and he underwent several surgeries; that his doctor told him to stay out of work for one year; that he was on crutches for nine months and that his knee was very painful; that in February 1998, his knee began to feel better but was still painful; that propping his leg up and stretching helped the pain; that prescription and over-the-counter pain medication relieved some of his pain; that his doctor scheduled a bone graft, but the Plaintiff did not have the procedure because he "couldn't afford it" (Tr. 166); that he had stopped seeing his doctor for the same reason; that he suffered back pain; that he took pain medication which did not

interfere with his ability to work; and that he walked with a cane.

As to daily activities, the Plaintiff testified that he took care of his personal needs; that he did not drive, go to the store, or do yard work; that he watched television and read during the day; that his son and fiancee did all of his household errands and chores; that he had no hobbies and did not go to church; that he could walk 50 yards without stopping, stand for ten minutes, and sit for 20 minutes; that he could not climb stairs or ladders; that he could not bend or stoop; and that he could lift 40 pounds if no bending was required.

The record also contains a number of representations by Plaintiff as contained in his various applications in support of his claim. On a Disability Report dated February 19, 1998, Plaintiff stated that his disabling condition was "a hole in r[ight] tibia bone, back problems" (Tr. 54); that "I can't walk, climb or stand for long periods of time" *Id.;* and that in his last job, he supervised a crew of nine men.

On a Reconsideration Disability Report, dated May 31, 1998, Plaintiff stated that his condition was worse; that his doctor had told him not to work; and that he required assistance with bathing and dressing.

A Report of Contact, dated July 2, 1998, reflects that Plaintiff stated he was having nightmares and was fearful about losing his leg, but denied having depression; that he had no problems getting along with other people; and that he had no mental or memory problems.

On a Claimant's Statement When Request For Hearing is Filed, dated August 12, 1998, Plaintiff stated that his condition and daily activities were unchanged.

On May 7, 1998, David Buchin, M.D., completed a Physical Residual Functional Capacity Assessment noting that a February 1998 orthopedic follow-up showed that Plaintiff's right leg was full weight bearing with full range of motion, but that X-rays revealed a "bony defect" in the tibia; that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds; that he could sit, stand, and/or walk 6 hours in an 8 hour workday; that his ability to push and/or pull was limited in his legs; and that he should never climb and could kneel, crouch, and crawl only occasionally.

On July 8, 1998, Brett Fox, Psy. D., completed a Psychiatric Review Technique and concluded that the Plaintiff had no medically determinable impairment.

On July 17, 1998, N. Shah, M.D., completed a Physical Residual Functional Capacity Assessment noting that a February 1998 orthopedic follow-up showed that Plaintiff's right leg was full weight bearing with full range of motion, but that X-rays revealed a "bony defect" in the tibia; that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds; that he could sit, stand, and/or walk 6 hours in an 8 hour workday; that his ability to push and/or pull was limited in his legs; and that he should never climb or balance; that he could stoop, kneel, crouch, and crawl only occasionally; and that he should avoid all exposure to hazards, heights, and machinery.

The medical records submitted to the ALJ (at or after the hearing) established that sometime prior to December 6, 1991, and following an automobile accident, the Plaintiff had surgery on his right knee and plates and screws were inserted during the operation.[2]

---

**2.** The record does not contain an operative note for this procedure. The Plaintiff testified

that the accident occurred in 1990.

On December 6, 1991, the Plaintiff saw his treating orthopedist, Dr. Stephen Sims, Miller Orthopaedic Clinic ("Miller"), Charlotte, North Carolina, who noted that Plaintiff's fracture had healed well. On December 9, 1991, a prominent screw was removed. On December 20, 1991, Dr. Sims released Plaintiff to return to work and instructed the Plaintiff to return in a few weeks. The Plaintiff missed his appointment to see Dr. Sims on January 20, 1992.

On January 7, 1997, Plaintiff, complaining of swelling and drainage in the knee area, was initially seen by Dr. David Kingery at Miller, who referred him to the Carolinas Medical Center ("CMC"). The same day, at CMC, the Plaintiff was diagnosed with osteomyelitis, underwent "irrigation and debridement" procedures, and the hardware from his prior surgery was removed. On January 9, 1997, and January 13, 1997, Plaintiff underwent further surgeries on his knee and necrotic bone was removed from Plaintiff's tibia.

On January 31, 1997, Plaintiff returned to Dr. Sims at Miller for follow up. Dr. Sims noted that Plaintiff "wore his knee immobilizer part of the time but not all of the time as we had asked him to do" (Tr. 101); that he told Plaintiff to continue his antibiotics; and that a bone graft may be necessary in the future.

On February 24, 1997, Plaintiff saw Dr. Sims, who completed a "Return to Work Authorization" form on which he checked off that Plaintiff "should not return to work" and commented that Plaintiff would "be out of work for approximately 12 months" (Tr. 134);[3] that this opinion was based in part on Dr. Sims' expectation that the Plaintiff would be undergoing further

surgery—a bone graft—in the upcoming months; and that the Plaintiff had "no real complaints" but the long term plan was to proceed with the bone grafting surgery once he was off his antibiotics.

On March 11, 1997, Plaintiff was cleared for the surgery.

Plaintiff did not see a doctor for almost a year. On February 9, 1998, Plaintiff returned to Dr. Sims, who noted that Plaintiff had not undergone the bone grafting procedure; that Plaintiff was progressing well; that Plaintiff had not been using crutches for six months and was not limping; that bone grafting surgery would be postponed; and that Plaintiff should not do any type of heavy work, should not climb, work at heights, or engage in any frequent squatting or bending. Dr. Sims instructed Plaintiff to return in six months for X-rays, but Plaintiff did not follow up on this treatment.

On March 1, 1999, over a year since he had last seen the Plaintiff, and after the hearing before the ALJ, Dr. Sims wrote a "To Whom It May Concern" letter stating that Plaintiff was not able to return to his previous work, but "would be a candidate only to do work that would allow him to do sedentary or sitting kind of work." (Tr. 150.)

The ALJ considered all of the above recited evidence and determined that Plaintiff was not "disabled" for Social Security purposes prior to August 4, 1997. It is from this determination that Plaintiff appeals.

### III. *STANDARD OF REVIEW*

█ The Social Security Act, 42 U.S.C. § 405(g) and § 1383(c)(3), limits

---

**3.** The Commissioner points out that it is unclear whether the pre-printed language on this form refers to a prohibition against all work activity, or whether Plaintiff was restricted from returning to his particular former work, which was heavy work, as a roofer (Tr. 134.)

this Court's review of a final decision of the Commissioner to: (1) whether substantial evidence supports the Commissioner's decision, *Richardson v. Perales,* 402 U.S. 389, 390, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); and (2) whether the Commissioner applied the correct legal standards. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir.1990); *see also Hunter v. Sullivan,* 993 F.2d 31, 34 (4th Cir.1992) (*per curiam*). The district court does not review a final decision of the Commissioner *de novo. Smith v. Schweiker,* 795 F.2d 343, 345 (4th Cir.1986); *King v. Califano,* 599 F.2d 597, 599 (4th Cir.1979); *Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir.1972).

As the Social Security Act provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). In *Smith v. Heckler,* 782 F.2d 1176, 1179 (4th Cir.1986), *quoting Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420 (1971), the Fourth Circuit defined "substantial evidence" thus:

> Substantial evidence has been defined as being "more than a scintilla and do[ing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*See also Seacrist v. Weinberger,* 538 F.2d 1054, 1056–57 (4th Cir.1976) ("We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence").

The Fourth Circuit has long emphasized that it is not for a reviewing court to re-

weigh the evidence, nor to substitute its judgment for that of the Commissioner, assuming the Commissioner's final decision is supported by substantial evidence. *Hays v. Sullivan,* 907 F.2d at 1456 (4th Cir.1990); *see also Smith v. Schweiker,* 795 F.2d at 345; *and Blalock v. Richardson,* 483 F.2d at 775. Indeed, this is true even if the reviewing court disagrees with the outcome—so long as there is "substantial evidence" in the record to support the final decision below. *Lester v. Schweiker,* 683 F.2d 838, 841 (4th Cir.1982).

## IV. *DISCUSSION OF CLAIM*

■ The question before the ALJ was whether at any time the Plaintiff became "disabled" as that term of art is defined for Social Security purposes.[4]

The ALJ considered the above-recited evidence and found after the hearing that Plaintiff had not engaged in substantial gainful activity "at any time relevant to [his] decision"; that the Plaintiff was 43 years old—a "younger individual"—with a high school education; that the Plaintiff suffered a post-tibial fracture bony defect, which was a severe impairment within the meaning of the Regulations; but that Plaintiff's impairment did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (a.k.a. "the Listings"); that Plaintiff was not able to perform his past relevant work as a roofer or roofing supervisor; that "within 12 months of his alleged onset of disability the [Plaintiff] regained and . . . retained a residual functional capacity for a full range of light[5]

---

**4.** Under the Social Security Act, 42 U.S.C. § 301, *et seq.,* the term "disability" is defined as an:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12 months. . . .
*Pass v. Chater,* 65 F.3d 1200, 1203 (4th Cir.1995).

**5.** "Light" work is defined in 20 C.F.R. § 404.1567(b) as follows:

and sedentary[6] work"; and that "given the [Plaintiff]'s age, education, past vocational experience, and residual functional capacity for a full range of sedentary work," under Rules 202.21 and 201.28 of the Medical–Vocational Guidelines, Plaintiff was not disabled. (Tr. 21–23.)

The Plaintiff essentially appeals the ALJ's determination of his residual functional capacity. *See* "Plaintiff's Motion for Summary Judgment" and "Memorandum in Support ..." at 1 (both document # 13). The undersigned finds that Plaintiff's assertion of error is without merit, however, and that substantial evidence supports the ALJ's conclusions regarding the Plaintiff's residual functional capacity.

The Social Security Regulations define "residual functional capacity" as "what [a claimant] can still do despite his limitations." 20 C.F.R. § 404.1545(a). The Commissioner is required to "first assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's] residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b). The Regulations also indicate that:

A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce [a claimant's] ability to do past work and other work.

*Id.*

The ALJ's opinion clearly indicates that he did, in fact, consider whether Plaintiff was limited in lifting, sitting, standing, walking, carrying, pushing, pulling or other physical functions. Agency evaluators concluded that he could lift 20 pounds occasionally and 10 pounds frequently—requirements for "light" work; that his strength, grip and dexterity were normal; that he could sit, stand, and/or walk 6 hours in an 8 hour workday, and that his ability to push and/or pull was limited only in his legs. Moreover, the Plaintiff testified that if he was not required to bend, he could lift 40 pounds. However, the ALJ found that Plaintiff was restricted to a degree commensurate with the performance of "light" or "sedentary" work as defined in the Regulations.

At the outset, the undersigned notes that no doctor has ever concluded that the Plaintiff is permanently disabled. The ALJ properly discounted the weight given to Dr. Sims' February 24, 1997 "Return to Work Authorization" form on which he checked off that Plaintiff "should not return to work" and commented that Plain-

---

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as

loss of fine dexterity or inability to sit for long periods of time.

6. "Sedentary" work is defined in 20 C.F.R. § 404.1567(a) as follows:

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and the other sedentary criteria are met.

tiff would "be out of work for approximately 12 months" (Tr. 134).

■ Although the opinion of a treating physician is to be accorded "great weight," the ALJ is not required to give it "controlling weight." *Craig,* 76 F.3d at 590, *quoting Hunter v. Sullivan,* 993 F.2d 31, 35 (4th Cir.1992). In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantive evidence, it should be accorded significantly less weight." *Craig,* 76 F.3d at 590, *citing* 20 C.F.R. § 416 .927 (1996).

■ Since *Craig,* it has been recognized that the current pertinent Social Security regulation refined this standard somewhat, and now provides as follows:

*If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.* When we do not give the treating source's opinion controlling weight, we apply the factors listed below, as well as the factors in paragraphs (d)(3) through (5) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

20 C.F.R. § 416.927(d)(2) (1999) (emphasis added). *See also Ward v. Chater,* 924 F.Supp. 53, 55–56 (W.D.Va.1996) (noting that § 416.927(d)(2) supersedes the Fourth Circuit's "treating physician rule" as set forth in *Craig* ). Thus, as a threshold matter, the ALJ is required to determine whether a physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evi-

dence" in the record, and thus entitled to "controlling weight."

If a physician's opinion is not given controlling weight, then the "factors listed below" and in paragraphs (d)(3) through (5) used to determine the amount of weight to be given it are (1) the length of the treatment relationship and the frequency of examination ("the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion"); (2) the nature and extent of the treatment relationship; (3) supportability ("the more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion"); (4) consistency ("the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion"); and (5) specialization ("[w]e generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist"). *Id.* The regulation also makes clear, however, that the ultimate determination of disability is reserved for the Commissioner, and "[a] statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." 20 C.F.R. § 416.927(e)(1).

In this case, substantial evidence supports the ALJ's determination of the weight to be afforded Dr. Sims' opinion that Plaintiff was disabled for 12 months following his surgery. As the ALJ noted, it is unclear whether the pre-printed language on this form refers to a prohibition against all work activity, or whether Plaintiff was restricted from returning to his particular former work, which was heavy work, as a roofer. Additionally, the ALJ noted that Plaintiff did not wear his knee

immobilizer as he was instructed; did not seek medical treatment from March 1997 through February 1998; did not undergo the bone grafting surgery that was originally contemplated in early 1997; did not return for the X-rays he had been advised to have; was able to walk without crutches within approximately six months of the January 1997 surgery; and in February 1998, walked without a limp.

The administrative record thus contains substantial evidence to support the ALJ's determination that Dr. Sims' opinion should not be afforded "controlling weight." Moreover, the ALJ's finding—that the Plaintiff was not disabled under the Guidelines because he could perform sedentary work—is entirely consistent with Dr. Sims' later opinions—recorded in the chart on February 9, 1998 and March 1, 1999—that Plaintiff could not do his previous roofing, or other heavy, work, but could do "sedentary or sitting kind of work." (Tr. 150.)

Rather than proving the existence of a disability, the record clearly supports the ALJ's essential conclusion: that Plaintiff suffered from—but was not disabled by—a post-tibial fracture bony defect. This conclusion is bolstered by the fact that Plaintiff's exams revealed that he recovered well after the 1997 surgery; and that he walked without aid of crutches and did not limp. Further, the Plaintiff claimed his health problems prevented him from engaging in daily activities or working, but radiographic images did not reveal that Plaintiff's condition was as serious as he maintained.

The Plaintiff repeatedly failed to follow his doctor's recommendations, missed appointments, and went long periods without even seeing his doctor. Indeed, between March 11, 1997 and March 1, 1999—the date of Dr. Sims' note that Plaintiff *could* do sedentary work—Plaintiff saw Dr. Sims only once. Finally, the Plaintiff testified that conservative treatment—pain medication, propping his leg up, and stretching—was effective to alleviate his pain. *See, e.g., Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir.1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling"), *citing Purdham v. Celebrezze,* 349 F.2d 828, 830 (4th Cir.1965); *and Mickles v. Shalala,* 29 F.3d 918, 921 (4th Cir.1994) (evidence of treatment and medical regimen followed by claimant is proper basis for finding of no disability) (Hall, J., concurring for divided panel).

In addition to the ALJ's treatment of the medical records, he properly applied the standard for determining a claimant's residual functioning capacity based on subjective complaints of pain, and the record contains substantial evidence to support the ALJ's conclusion that Plaintiff's testimony was *not* fully credible.

■ The determination of whether a person is disabled by non-exertional pain or other symptoms is a two-step process. "First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." *Craig v. Chater,* 76 F.3d 585, 594 (4th Cir.1996), *citing* 20 C.F.R. § 416.929(b); § 404.1529(b); 42 U.S.C. § 423(d)(5)(A). If there is such evidence, then the ALJ must evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects [his] ability to work." *Id.* at 595, *citing* 20 C.F.R. § 416.929(c)(1) *and* § 404.1529(c)(1). The regulations provide that this evaluation must take into account:

not only the claimant's statements about his or her pain, but also "all the available evidence," including the claimant's

medical history, medical signs, and laboratory findings; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it.

*Id.* (citations omitted).

The record contains evidence of Plaintiff's post-tibial fracture bony defect—a condition which *could* reasonably be expected to produce some of the pain claimed by Plaintiff—and thus the ALJ essentially found that Plaintiff could satisfy the first prong of the test articulated in *Craig.* However, the ALJ evaluated the "intensity and persistence of his pain, and the extent to which it affects his ability to work," and essentially found Plaintiff's subjective description of his limitations not credible.

■ "The only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life." *Mickles,* 29 F.3d at 921, *citing Hunter v. Sullivan,* 993 F.2d 31, 33 (4th Cir.1992) (claimant's failure to fill prescription for painkiller, which itself was indicated for only mild pain, and failure to follow medical and physical therapy regimen supported ALJ's inference that claimant's pain was not as severe as he asserted). As noted above, the record before the ALJ contained substantial evidence to support a finding of inconsistency between Plaintiff's claims of inability to work and his objective ability to carry on with moderate daily activities. Specifically, Plaintiff testified that he continued to take care of all of his personal needs, but spent his days only watching television and reading; and that he was unable to do any household chores or errands.

■ However, the Plaintiff's testimony is belied by his statements to Dr. Sims. For example, the Plaintiff brought a walking cane to the hearing and testified that he could not walk without it. Further, the Plaintiff testified that he used crutches for almost a year following his 1997 surgery. However, the Plaintiff told Dr. Sims that he gave up his crutches within six months of surgery; Dr. Sims' noted that Plaintiff walked without even a limp; and the medical record contains no reference to Plaintiff having any long term difficulty walking, much less requiring a cane. Moreover, the Plaintiff's failure to follow his doctor's recommendations or to even seek medical treatment is substantial evidence that his testimony was not credible. *See Hunter,* 993 F.2d at 33.

Although the medical records in this case establish that Plaintiff experienced pain and mental and emotional difficulties to some extent or degree, as the Fourth Circuit has noted, it is the ALJ's responsibility, not the Court's, "to reconcile inconsistencies in the medical evidence." *Seacrist v. Weinberger,* 538 F.2d 1054, 1056–57 (4th Cir.1976). Moreover, the facts noted by the ALJ clearly support the ultimate conclusion that Plaintiff suffered from, but was not disabled from working by his combination of impairments.

■ Simply put, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the Secretary's designate, the ALJ)." *Mickles v. Shalala,* 29 F.3d 918, 923 (4th Cir.1994), *citing Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir.1987). This is precisely such a case, as it contains substantial evidence to support the ALJ's determinations of the credibility of Plaintiff's subjective complaints of pain; his activities of daily life; and his residual functional capacity.

## V. *ORDER*

NOW, THEREFORE, IT IS OR-DERED:

1. Plaintiff's "Motion For Summary Judgment" (document # 13) is **DENIED;** Defendant's "Motion for Summary Judgment" (document # 14) is **GRANTED;** and the Commissioner's decision is **AFFIRMED.**

2. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.